[Civ. No. 23470.   First Dist., Div. Two.   July 25, 1967.]

NULAID FARMERS ASSOCIATION, Plaintiff and Respondent, v. VITO J. LaTORRE et al., Defendants; CENTRAL COAST FRYER FARMS, INC., Intervener and Appellant; ROBERT H. HENRY, as Receiver, etc., Defendant and Respondent.

Henderson, Vanoli & Dok, Christy, Costello, Hoffman & Premo and Eugene M. Premo for Intervener and Appellant.

Wyckoff, Parker, Boyle & Pope and Bruce A. Richardson for Plaintiff and Respondent.

J. T. Harrington for Defendant and Respondent.

SHOEMAKER, P. J.—This is an appeal by Central Coast Fryer Farms, Inc. (hereafter referred to as "Central") from a judgment of dismissal entered upon the sustaining without leave to amend of a general demurrer to Central's complaint in intervention.

On July 16, 1963, plaintiff Nulaid Farmers Association filed a complaint to foreclose certain chattel mortgages held by it against Vito LaTorre and others, and asking that a receiver be appointed to hold and operate various poultry farms owned by defendants pending the action.

On the same day, upon a proper showing, by an ex parte order Robert Henry was appointed receiver of the farms and was empowered, "under the control and subject to the order of the Court, to take, care for, keep possession of, manage, operate and conduct the poultry farms . . . and to take charge and manage [said] property . . . and to collect rents, issues and profits and do all things necessary for the preservation and repair of such property and the reduction of the indebtedness described in said complaint . . . and with all other usual powers and duties of a Receiver."

On August 12, 1963, this order was confirmed.

On September 24, 1965, Central filed a complaint in intervention which alleged that on May 27, 1965, Central and the receiver had entered into a written contract which provided for the growing of fryer chickens upon the Elkhorn Ranch, one of the properties subject of the receivership. This contract provided that Central was to place and maintain upon the receiver's land and facilities one fryer chick per square foot of brooding house, for a total of approximately three hundred sixty thousand to four hundred fifty thousand birds. One hundred twenty thousand birds per week were to be placed upon the land for the first three weeks, and one hundred fifty

thousand per week for the following three weeks. The receiver was obligated, at his own cost, to raise the fryer chicks in a satisfactory manner and to furnish the necessary equipment, water, power, lights and labor to raise day-old chicks to a marketable age of nine weeks. When the chicks attained marketable age, Central was obligated to remove them from the premises and to pay the receiver a minimum of 6 cents per saleable bird. The receiver was prohibited, during the term of the contract, from raising poultry not owned by Central on the premises without Central's consent.

Although the contract was dated May 27, 1965, it was to ''commence'' on November 25, 1965 and, unless canceled, was to continue for the completion of eight broods. Both parties were given the right to cancel the contract upon 30 days' notice, but it was provided that if the receiver elected to cancel at a time when Central had contracted for or had eggs set in incubators for the project, the receiver was required to accept and raise the chicks to saleable and marketable age.

In the first count, Central alleged that in reliance on the contract it had contracted with three other named parties for the purchase of eggs and chicks in order that it could perform its side of the contract with the receiver; that on September 17, 1965, after Central had already entered into the above-mentioned contracts to purchase eggs and chicks, it received notice of cancellation of the contract from the receiver; that Central was informed and believed that the receiver had orally agreed to lease the Elkhorn Ranch to a competitor of Central's for the same term provided for in the contract between Central and the receiver; that Central had never given its consent to such lease; that Central had thus far performed all of its obligations under the contract with the receiver and stood ready and willing to complete its performance; that damages would be inadequate to compensate Central for the detriment it would suffer if the receiver were allowed to breach the contract; that it was necessary and proper that the court issue a restraining order specifically enforcing the contract between Central and the receiver and prohibiting the receiver from breaching said contract, placing other poultry on the Elkhorn Ranch during the term of said contract or in any other way interfering with the performance of the contract during the term thereof or until the chicks for which Central had contracted had grown to a saleable and marketable age.

In the second count, Central incorporated the factual

allegations of the first count and further alleged that by the attempted cancellation of September 17, 1965, the receiver had totally repudiated his contract with Central; that Central was unable to obtain like facilities; that by reason of the receiver's breach of contract, Central had been damaged in the sum of $500,000.

Central's prayer followed the pleadings as noted.

On September 29, 1965, the receiver filed a general demurrer to the complaint in intervention. It was urged that the complaint was fatally defective because (1) it contained no allegations to the effect that the receiver had obtained court approval of the contract with Central and (2) it was based upon a contract which was void for lack of mutuality because it authorized Central to terminate said contract at will.

The demurrer was sustained without leave to amend and judgment was entered that Central take nothing.

The record discloses that the court sustained the demurrer upon both of the grounds urged in support thereof and that it based its decision upon an examination of the complaint in intervention, the written contract attached to the complaint and the record of the prior proceedings in the action. ▮ It is settled that a court may take judicial notice of its own records when ruling upon a demurrer. (*Dwan* v. *Dixon* (1963) 216 Cal.App.2d 260, 265 [30 Cal.Rptr. 749].)

With regard to the first ground raised in support of the demurrer, the complaint itself is devoid of any allegation that the receiver obtained court approval of the contract with Central. This omission was not one which could have been remedied through amendment, since the record shows that such consent was not in fact obtained.

The sole question involved is whether the absence of consent was fatal to the statement of any cause of action against the receiver.

Code of Civil Procedure, section 568, provides that "The receiver has, under the control of the court, power to bring and defend actions in his own name, as receiver; to take and keep possession of the property, to receive rents, collect debts, to compound for and compromise the same, to make transfers. and generally to do such acts respecting the property as the court may authorize."

▮ Where a receiver's powers and duties are not directly prescribed by statute, they are dependent upon the court's order of appointment. (*Haswell* v. *Costellcnos* (1932) 126 Cal. App. 427, 431 [14 P.2d 846].)

From our examination of the record, we see that neither the applicable statute nor the order appointing Henry receiver contain language which can reasonably be construed as authorizing him, without the consent of the court, to enter into a contract of such magnitude as that with Central. The powers enumerated in the order of July 16, 1963, were specifically granted "under the control and subject to the order of the Court," and do not include the power to enter into contracts with regard to the properties subject of the receivership beyond those necessary to maintain and preserve them. A reading of the contract with Central reveals that the receiver obligated himself to devote all of the equipment and facilities of the Elkhorn Ranch to the raising of poultry to be furnished by Central. Since the contract provides for the raising of eight broods of day-old chicks to the age of nine weeks, it is apparent that in the absence of cancellation by one of the parties, performance of the contract would extend over a substantial period of time. The receiver's right to cancel the contract was severely limited in that he was at all times obligated to accept and raise to marketable age whatever chicks Central had already contracted to purchase and the contract was extremely vague as to the time when Central was to make its contracts of purchase. Although performance of the contract between Central and the receiver was not to "commence" until November 25, 1965, it is likely that the parties meant that actual performance, or the furnishing and raising of the chicks, was to commence on that date and that Central was thus expected to prepare for such performance, sometime prior to the date specified, by contracting for the purchase of eggs or chicks. The contract contains no limitations whatever on Central's right to enter into any such contract or contracts of purchase and does not require that such right be exercised on or after a specified date or prohibit Central from entering into a single contract for the purchase of eight consecutive broods of chicks.

A contract of this nature, if valid and enforceable, would significantly interfere with the court's control over the Elkhorn Ranch and the facilities and equipment located thereon and would prevent plaintiff Nulaid Farmers Association from foreclosing, during the duration of the contract, the chattel mortgages of personal property located on the ranch and required for the raising of Central's poultry.

Research discloses no California case holding that a receiver's failure to obtain court approval of a major contract

affecting funds or property of the receivership is or is not a demurrable defect in a complaint to enforce or recover damages under such a contract. ▮ It is the general rule, however, that a receiver has no right or power to make a contract binding the property or fund in his custody without the authority or approval of the court and that an unauthorized agreement of a receiver does not bind the court in charge of the receivership, is not recognized as a contract of the receivership, and is treated as the receiver's own contract. (75 C.J.S., Receivers, § 174, subd. (b), p. 817.)

In *Beard* v. *Smith* (Tex.Civ.App. 1940) 136 S.W.2d 886, plaintiffs brought suit against a receiver to obtain cancellation of an oil, gas and mineral lease held by the trust estate. Although the trial court granted a default judgment in favor of plaintiffs, the judgment was subsequently reversed by the Texas Court of Civil Appeals, which held that the allegations of plaintiffs' petition were subject to general demurrer and insufficient as a matter of law to support the judgment rendered because it was not alleged that the receiver possessed authority to relinquish the lease. The court further held that the proof offered by plaintiffs failed to show any such authority, since it was established only that the receiver was empowered '' 'generally to manage the property of [the] trust estate *subject to the further orders of this court'* '' (p. 889).

▮ The order appointing the receiver did not authorize him to enter into the contract in question, but merely invested him with the usual powers to manage, preserve and repair the property subject of the receivership ''under the control and subject to the order of the Court,'' hence court approval for such a contract was necessary. We are of the opinion that since Central has seen fit to sue the receiver solely in his official capacity, and has failed to allege court approval of the contract, which is a condition precedent to the statement of any cause of action, the demurrer was properly sustained on that ground. In view of our determination, we need not discuss whether the contract was also void and unenforceable because lacking in mutuality.

Judgment affirmed.

Agee, J., and Taylor, J., concurred.